


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed October 06, 2010**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| ROBERT ERSKINE CLINE JR., § | CASE NO. 09-45977-DML-7 | |
| § | | |
| DEBTOR. § | | |

| | | |
|---|---|---|
| § | | |
| WILLIAM T. NEARY, § | | |
| UNITED STATES TRUSTEE, § | | |
| § | | |
| PLAINTIFF, § | ADVERSARY NO. 09-4424 | |
| § | | |
| v. § | | |
| § | | |
| ROBERT ERSKINE CLINE JR., § | HON. D. MICHAEL LYNN | |
| § | | |
| DEFENDANT. § | | |

**Findings of Fact and Conclusions of Law**

## Findings of Fact

### Background Facts

1.      Robert Erskine Cline, Jr. ("Cline") filed a voluntary chapter 7 petition on September 26, 2009, commencing the captioned case.

2.      As required by 11 U.S.C. § 521, Cline filed schedules and a statement of financial affairs (the "SOFA") in his chapter 7 case on October 13, 2009.

3.      Cline signed his schedules and his SOFA declaring that the documents were true and correct to the best of his knowledge, information and belief.

4.      Cline graduated from Henderson High School in June of 1971. Although Cline never received a degree, he attended several colleges and enjoyed considerable success as a businessman in the telecom industry, serving as a founder and CEO of two companies.

5.      Cline and his former spouse, Debra Lyn Cline ("Debra Cline"), separated in October of 2006.

6.      On May 26, 2009, less than six months before Cline's bankruptcy filing, Cline and Debra Cline were divorced by operation of a final decree of divorce (the "Divorce Decree").

7.      The Divorce Decree divides the marital property of Cline and Debra Cline.

8.      Cline and Debra Cline represented themselves in their divorce.

9.      A Steinway grand piano (the "Steinway"), valued in the Divorce Decree in the estimated amount of $20,000, was awarded to Cline by the Divorce Decree.

10.     Cline purchased the Steinway used in the 1980s for his daughters to play.

11.     The Steinway is sun bleached, has a cracked soundboard, and has broken and stuck keys.

12. The sun bleaching of the Steinway occurred in the 1980s when Cline lived in California.

13. Cline does not recall when the soundboard was cracked or when the keys were damaged.

14. The Steinway was not listed by Cline in his Schedule B.

15. The value attributed to the Steinway in the Divorce Decree was chosen to balance the awards of property to Cline and Debra Cline rather than to reflect its actual worth.

16. On August 28, 2008, Cline and Debra Cline executed an Oil and Gas Lease with XTO Energy, Inc., relating to real property located at 1804 Grosvenor Green, Block A, Lot 35, Broughton, Colleyville, Texas (the "Oil and Gas Lease").

17. Cline and Debra Cline received $13,072.50 from XTO Energy, Inc., in exchange for the conveyance of the mineral interests under the Oil and Gas Lease.

18. On November 18, 2008, the $13,072.50 was deposited in an account held in the names of Cline and Debra Cline.

19. Cline and Debra Cline utilized the $13,072.50 received from XTO Energy, Inc., in exchange for the conveyance of the mineral interests under the Oil and Gas Lease to pay personal expenses.

20. The transfer of the mineral interests to XTO Energy, Inc., under the Oil and Gas Lease was not listed by Cline in his SOFA in response to SOFA question 10.

21. Until June of 2009, Cline operated a residential construction business incorporated as Talisman Homes, Inc. ("Talisman Homes").

22. Cline at all relevant times owned 100% of Talisman Homes.

23. Cline at all relevant times was an officer of Talisman Homes.

24. In the course of the residential construction business, Talisman Homes and Cline purchased a number of lots from David Bagwell in the Broughton subdivision of Colleyville, Texas. The purchased lots were variously titled in Cline, Cline and Debra Cline, and Talisman Home.

25. Cline lists a $700,000 receivable from Talisman Homes in his Schedule B relating to money he advanced to Talisman Homes. He asserts this receivable is uncollectable.

26. Talisman Homes has no remaining assets and is not operating.

27. Cline used his personal credit cards in connection with and for the benefit of Talisman Homes.

28. On or about April 10, 2009, Cline and Debra Cline sold real property titled in their names and located at Broughton (Colleyville), Block A, Lot 35, Tarrant County, 1804 Grosvenor Green, Colleyville, Texas 76034 ("Broughton Lot 35") to Debra Cline as Trustee for the Jessica Dyan Cline Irrevocable Trust (the "JDC Trust") as to an undivided 51% interest and to Debra Cline as Trustee for the Melissa Renee Cline Irrevocable Trust (with the JDC Trust, the "Trusts") as to an undivided 49% interest.

29. At the time of sale, Broughton Lot 35 was a vacant lot.

30. Cline and Debra Cline sold Broughton Lot 35 for gross consideration of $120,000, and received from the sale $111,221.30 cash.

31. Cline and Debra Cline split the net proceeds of the sale of Broughton Lot 35.

32. On April 13, 2009, $55,610.85 was deposited into Cline's bank account which included his half ($55,221.30) of the proceeds from the sale of Broughton Lot 35.

33. Cline used part of his share of the proceeds of the sale of Broughton Lot 35 to pay down his home mortgage, taxes, community dues, yard and pool maintenance, insurance

and utilities.

34. Some of the net proceeds of the sale of Broughton Lot 35 received by Cline were used for the benefit of Talisman Homes.

35. The transfer of Broughton Lot 35 was not listed in response to SOFA question 10.

36. On or about July 28, 2008, Cline sold real property titled in his name and located at Broughton (Colleyville), Block A, Lot 36, Tarrant County, 1808 Grosvenor Green, Colleyville, Texas 76034 ("Broughton Lot 36") to John Kerwin Hammer and Maria Adriana Lopez-Hammer.

37. At the time of sale, Broughton Lot 36 was a vacant lot.

38. Cline sold Broughton Lot 36 for gross consideration of $168,216.48, and received from the sale $155,702.70.

39. On August 4, 2008, $155,702.70 was deposited into Cline's bank account.

40. Cline used part of the proceeds of the sale of Broughton Lot 36 to pay current approximately six months arrearages on his home mortgage.

41. Some of the net proceeds of the sale of Broughton Lot 36 were used to pay Talisman Home's debts, which had been charged by Cline to his personal credit cards.

42. The transfer of Broughton Lot 36 was not listed in response to SOFA question 10.

43. While Cline asserts that the purchase and sale of Broughton Lot 35 and Broughton Lot 36 were part of Talisman Homes' business and accomplished in the ordinary course of business, the evidence reflects that Broughton Lot 35 and Broughton Lot 36 were owned in Cline and Debra Cline's names and Cline's name respectively, and that proceeds of the sales of Broughton Lot 35 and Broughton Lot 36 were deposited into Cline's personal bank accounts, not into Talisman Homes' bank account.

44. By contrast, proceeds of sales of real property owned in the name of Talisman Homes routinely were deposited in the account of Talisman Homes.

45. Cline was not the only creditor of Talisman Homes, but he held the vast majority of its debt.

46. Cline considered Broughton Lots 35 and 36 to be property of Talisman Homes as to which he (and Debra Cline) held only nominal title.

47. Cline believed the sales of Broughton Lots 35 and 36 were in fact for the account of Talisman Homes and that, in light of the sums owed him by Talisman Homes, the proceeds of those sales could properly be used to pay his debts.

48. Cline did not at any time, in the SOFA or otherwise, disclose to his chapter 7 trustee his title to and sale of Broughton Lots 35 and 36.

49. Had Cline's chapter 7 trustee known of Cline's title to and sale of Broughton Lots 35 and 36, she would have investigated the sale of those lots.

50. Cline knew or should have known that the transfers of the Oil and Gas Lease to XTO Energy, Inc., and of Broughton Lots 35 and 36 were transactions that were subject to disclosure in response to SOFA question 10 or otherwise.

## Conclusions of Law

### 11 U.S.C. § 727(a)(4)

1. "The court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A).

2. A party objecting to discharge pursuant to section 727(a)(4)(A) bears the burden of proving by a preponderance of the evidence that (1) the debtor made a statement under

oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Sholdra v. Chilmark, LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001). *See also Cadle Company v. Mitchell (In re Mitchell)*, 102 Fed.Appx. 860, 2004 WL 1448041 (5th Cir. 2004).

3. A false oath within the purview of section 727(a)(4)(A) may include a false statement or omission by the debtor in the debtor's schedules and statement of financial affairs. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). *See also The Cadle Company v. Guenther (In re Guenther)*, 333 B.R. 759, 766 (Bankr. N.D. Tex. 2005).

4. "In determining whether an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears on a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Beaubouef*, 966 F.2d 174 at 177; *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 356 (Bankr. N.D. Tex. 2010) (quoting *In re Beaubouef*).

5. The omission of the sales of Broughton Lot 35 and Broughton Lot 36 from SOFA question 10 are false oaths within the purview of 11 U.S.C. § 727(a)(4). Each omission was material and related materially to Cline's chapter 7 case.

6. Cline knowingly and intentionally omitted to include each of the transfers of Broughton Lot 35 and Broughton Lot 36 in his SOFA as a transfer made within two years prior to filing his bankruptcy petition.

7. The failure to include the transfers of Broughton Lot 35 and Broughton Lot 36 are false omissions because each transfer occurred within the two years prior to Cline's petition date of September 26, 2009, and the transfers were sales of real property held in Cline's name, proceeds of which Cline received and used.

8. The failure to disclose the transfers of Broughton Lot 35 and Broughton Lot 36 are material, since the failure to disclose the transfers of real property bears a direct relationship to Cline's estate, business transactions, and the existence and disposition of his property.

9. To the extent that a portion of the proceeds of the sales of Broughton Lot 35 and Broughton Lot 36 were also utilized to pay Talisman Homes' debts, that is not an excuse for failing to disclose the transfers because Cline's payment of the debts of his insolvent company has a direct bearing on Cline's estate and business transactions. The payment of another entity's debts may constitute preferential transfers or fraudulent conveyances that the trustee may have wished to investigate and/or recover.

10. Cline's belief that Broughton Lots 35 and 36 were, in fact, sold by and for Talisman Homes does not affect the necessity that their transfer be disclosed such that the transfer could be investigated by Cline's chapter 7 trustee.

11. The omission of the sale of mineral interests to XTO Energy, Inc., from SOFA question 10 is a false oath within the purview of 11 U.S.C. § 727(a)(4).

12. The failure to include the transfer of the Oil and Gas Lease to XTO Energy, Inc., is a false omission because the transfer occurred within the two years prior to Cline's petition date of September 26, 2009, and it is the sale of a real property interest.

13. The failure to disclose the transfer of the mineral interests to XTO Energy, Inc.,

bears a direct relationship to Cline's estate and his business interests and the existence and disposition of assets and is, thus, a material omission. Because of this omission, Cline's chapter 7 trustee was not afforded the opportunity to examine the transaction to determine if the Oil and Gas Lease should be recovered by the estate for the benefit of creditors.

14. Just as fraudulent intent may be shown by a reckless disregard for the truth (*see Sholdra*, 259 F.3d at 383), so, too, a knowing failure to disclose manifests a fraudulent intent regardless of the reasoning or motivation of the debtor. Were it otherwise a debtor might receive a discharge notwithstanding an intentional failure to disclose a material fact which failure to disclose could frustrate investigation of the debtor's estate by the chapter 7 trustee[1].

---

[1] The court does not believe that Cline concealed the various transfers with an intent to deceive or from other nefarious motive. It is credible that he honestly concluded that the transfers did not need to be disclosed. But SOFA question 10, on its face, clearly requires disclosure of the transfers at issue. Cline certainly possesses the sophistication necessary to recognize that those transfers fall within the ambit of the disclosure requirement.

Indeed, Cline's argument in reality is that his failure to disclose the transfers was not material – the property transferred was not his and his appropriation of proceeds was no more than a short cut to payment by Talisman Homes against its debt to him. But Cline's chapter 7 trustee testified she would have investigated the transfers had she known about them. Had Cline even mentioned the transfers during his creditors' meeting under Bankruptcy Code § 341, the trustee might have done so. As it was, she did not have the knowledge necessary to trigger an investigation.

Cline made the decision not to disclose the transfers. Although he may not have made that decision with fraudulent intent, the decision is not one the court or the bankruptcy system can tolerate. It is essential that debtors be motivated to maximize disclosure, and allowing Cline his discharge would frustrate that necessary goal. If information might cause inquiry by the chapter 7 trustee, it is information that is material and must be disclosed, especially where, as here, the information is facially called for in the standard form SOFA. That the transfer of Broughton Lot 35 to Debra Cline for the benefit of the Trusts was made to Cline's insiders (*see* Bankruptcy Code § 101(31)) exacerbates the ill effect of Cline's omissions.

The court finds Cline to be an honest man and the sort of debtor Congress intended to give a fresh start through the Bankruptcy Code. Indeed, except for the omissions at issue in this adversary proceeding, Cline appears to have done exemplary work in completing his schedules and the SOFA. Nevertheless, his conscious decision – much more troubling than the carelessness condemned by *Sholdra*, *Beaubouef*, and their progeny – not to disclose transactions worthy of investigation by the trustee requires the conclusion that Cline is not entitled to a discharge under

15. "A debtor's paramount duty is to carefully consider all of the questions posed on the petition, schedules, and statements and to verify that all information listed is correct." *In re Crumley*, 428 B.R. at 367. The purpose of the standards set forth under 11 U.S.C. § 727(a)(4) is "to ensure that debtors provide all relevant information without the need for lengthy examination and investigations into the affairs of the estate." *Id*. at 367-68. Accordingly, these omissions from Cline's SOFA must be deemed to satisfy the element of fraudulent intent for purposes of section 727(a)(4)(A). The court need not here address whether other disclosure – e.g., at a section 341 meeting – would preserve a debtor's entitlement to a discharge.

16. For the foregoing reasons, the court finds that Cline's discharge should be denied in accordance with 11 U.S.C. § 727(a)(4).

The United States trustee is directed to prepare and submit a judgment consistent with the foregoing findings of fact and conclusions of law.

# # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # # #

---

section 727(a)(4)(A).